## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

American Towers, Inc., a Delaware
Corporation,

Court File No. _____

             Plaintiff,

**COMPLAINT**

v.

Polnet Communications, Ltd., an
Illinois Corporation,

             Defendant.

Plaintiff American Towers, Inc. ("ATC"), as and for its Complaint against Defendant Polnet Communications, Ltd. (Polnet), states and alleges as follows:

### THE PARTIES

1.    ATC is a corporation organized under the laws of the State of Delaware and maintains a place of business at 10 Presidential Way, Woburn, MA 01801.

2.    ATC is engaged, among other things, in the business of leasing and licensing cellular sites and towers to customers. The customers use the sites and towers to provide cellular, wireless, radio, and television services to their network of subscribers. The cellular tower site at issue in this matter is located in Milwaukee, Wisconsin.

3.    Upon information and belief, Polnet is a corporation organized under the laws of the State of Illinois and maintains its principal place of business at 3656 W. Belmont Ave., Chicago, IL 60618. Polnet is in the business of owning and running radio stations in the United States.

1

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 as the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00, and Plaintiff and Defendant are of diverse citizenship.

5.     The Court has personal jurisdiction over Polnet by virtue of its continuous, systematic, and substantial contacts with the State of Wisconsin, including the leasing of property located in the State of Wisconsin.

6.     Venue is properly before this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to ATC's claims occurred in this judicial district, and the licensed property at issue in this action is located in this judicial district.

## FACTS

**The License Agreement**

7.     ATC and Polnet entered into a License Agreement on or about December 21, 2009 ("License Agreement"), pursuant to which Polnet received use of ATC tower site number 75054, located in Milwaukee, Wisconsin (the "Milwaukee Tower") in exchange for monthly license fees.  A true and correct copy of the License Agreement is attached hereto as **Exhibit 1** and incorporated by reference.

8.     The License Agreement provides that in exchange for a monthly license fee Polnet may use the Milwaukee Tower, including the transmission and receipt of radio

2

frequencies and install, maintain, operate, service, modify and/or replace its approved equipment at the Milwaukee Tower.

9.     The parties' license fee is $2,500.00 increased by an annual escalator of 5% on each anniversary of the commencement date.

10.     The License Agreement provides that non-payment is an event of default, and, if non-payment is not cured within thirty days of default, ATC is entitled to exercise all available remedies. These remedies include, but are not limited to, terminating the License Agreement, accelerating and declaring all monthly payments immediately due and payable, disconnection, removal and storage of any equipment, and recovery of penalties, interest, costs, and attorneys' fees.

11.     The License Agreement provides that any equipment on the site is deemed abandoned by Polnet thirty days after ATC terminates the License Agreement if Polnet fails to remove its equipment beforehand.

**Polnet's Breach of the License Agreement**

12.     Polnet failed to make the requisite monthly license fee payments under the License Agreement.

13.     Following Polnet's continued failure to pay the monthly license fees,  ATC sent correspondence dated February 17, 2016 to Polnet providing formal and final written notice of Polnet's default for Polnet's failure to remit license fees on a monthly basis.

14.     Plaintiff's February 17, 2016 default letter demanded payment of $98,483.97 for past license fees under the License Agreement, and provided a detailed accounting of the amounts due.

15.     In compliance with the License Agreement, ATC provided Polnet with 30 days to cure the default and indicated that failure to cure would result in ATC's pursuit of any and all remedies available under the License Agreement, including immediate termination of the License Agreement, acceleration of the amounts due, and imposition of ATC's reasonable attorneys' fees, court costs, removal and storage fees for any equipment, and other costs reasonably incurred by ATC in recovering these amounts.

16.     The thirty-day cure period expired on March 18, 2016 without Polnet remitting any payment under the License Agreement.

17.     On April 29, 2016, ATC accelerated all amounts due and owing. The acceleration was confirmed in correspondence sent to Polnet's counsel, Kevin V. Hunt, again seeking payment for amounts due and owing.

18.     Polnet has failed to cure its default and make payment to ATC.

19.     As of June 30, 2016, Polnet owes $120,049.73 in past license fees, late fees, and interest under the License Agreement. Polnet's total, accelerated remaining liability, discounted by an annual percentage rate of 5% as required under the License Agreement, is approximately $272,938.06.

20.     ATC has been forced to retain counsel, and incur other fees and costs, to enforce its rights under the License Agreement, all of which are recoverable from Polnet.

4

## COUNT I: BREACH OF CONTRACT

21.     ATC restates and realleges the preceding paragraphs as if set forth fully herein.

22.     The License Agreement constitutes a valid and enforceable contract, the terms of which are binding on ATC and Polnet.

23.     ATC has fully performed its obligations under the License Agreement.

24.     Polnet's payment of monthly license fees under the License Agreement is a material term of the License Agreement.

25.     Polnet breached this material term of the License Agreement by failing to make monthly licensing fee payments from April 2014 through the present.

26.     ATC has satisfied its contractual condition precedents by providing Polnet written notice of default and opportunity to cure default.

27.     Polnet failed to cure the default in payment under the License Agreement.

28.     As a direct and proximate cause of Polnet's breach of the contractual payment provisions, ATC has been damaged in an amount of $120,049.73, as of June 30, 2016, based on past licensing fees, late fees, and interest already accrued and due and owing under the License Agreement.

29.     Based on the acceleration provisions in the License Agreement, ATC is entitled to damages in excess of no less than $272,938.06, which constitutes the remaining fee payments under the License Agreement discounted by an annual percentage rate equal to 5%, accrued late fees and interest to date, in addition to interest and late fees to be accrued in the future, removal and storage fees for the equipment, if any, reasonable attorneys' fees and

5

costs, and field verification expenses and other costs associated with Polnet's breach, the exact amount to be determined at trial.

## COUNT II: ACCOUNT STATED

30.     ATC restates and realleges the preceding paragraphs as if set forth fully herein.

31.     ATC prepared and delivered regular invoices or correspondence to Polnet for monthly license payments pursuant to the License Agreement.

32.     Having received the invoices, Polnet did not object to the invoices or the information contained therein.

33.     Despite having received and accepted the invoices, without objection, Polnet has failed to make full payment to ATC under the License Agreement.

34.     Polnet's acceptance of the invoices, without objection, constitutes an account stated.

35.     As a result, ATC has suffered damages of no less than $272,938.06, which constitutes the remaining fee payments under the License Agreement discounted by an annual percentage rate equal to 5%, accrued late fees and interest to date, in addition to interest and late fees to be accrued in the future, removal and storage fees for the equipment, if any, reasonable attorneys' fees and costs, and field verification expenses and other costs associated with Polnet's breach, the exact amount to be determined at trial.

WHEREFORE, Plaintiff American Towers, Inc. requests relief from the Court as follows:

1.     An award of monetary damages in an amount in excess of $272,938.06, the specific amount of which will be proven at trial, including but not limited to accelerated payment under the License Agreement, late fees, interest, removal and storage fees for the equipment, if any, and reasonable attorneys' fees and costs, based on Defendant's breach of the License Agreement;

2.     An Order for the removal of Polnet's property or equipment, if any, located on the Milwaukee Tower site.

3.     Awarding Plaintiff American Towers, Inc. such other and further relief as the Court deems just and equitable.

**MESSERLI & KRAMER P.A.**

Dated: June 22, 2016

s/Joshua A. Hasko
Joshua A. Hasko
Matthew P. Lindeman
100 South Fifth Street, Suite 1400
Minneapolis, MN 55402-4218
Telephone: (612) 672-3600
jhasko@messerlikramer.com
mlindeman@messerlikramer.com

**ATTORNEYS FOR PLAINTIFF**

1318483.2

**LICENSE AGREEMENT**
ATC Contract No: TBD

This LICENSE AGREEMENT (**"Agreement"**) made as of the latter signature date hereof (**"Effective Date"**) by and between American Towers, Inc., a Delaware corporation, with a place of business at 10 Presidential Way, Woburn, MA 01801 (**"Licensor"**) and Polnet Communications, Ltd., an Illinois corporation, with a place of business at 3656 W. Belmont Ave., Chicago, IL 60618 (**"Licensee"**).

## I. TOWER SITE INFORMATION:

Site Name:      MILWAUKEE WI1
Site Number:    75054
Address and/or location of Tower Site (as defined in Section 1(e) herein): 4350A N. Humboldt Blvd., Milwaukee, WI, 53212
Tower Site Coordinates:    Lat. 43-5-46.22 N   Long. 87-54-15.03 W

## II. NOTICE & EMERGENCY CONTACTS:

- Licensee's local emergency contact (name and number): Kent Gustafson/ 847-487-8825.
- Licensor's local emergency contact: Network Operations Communications Center (800) 830-3365.
- Notices to Licensee shall be sent to the address above to the attention of Walter K. Kotaba.
- Notices to Licensor shall be sent to the address above to the attention of Contracts Manager.
- Licensor's Remittance Address: American Tower Corporation, Dept. 5305, P.O. Box 30000, Hartford, CT, 06150-5305; all payments shall include a reference to the Site Name and Site Number as identified above in Section I.

## III. PERMITTED USE OF TOWER SITE BY LICENSEE:

Transmitting and Receiving frequencies: See Exhibit A for specific frequencies
Antenna mount height on tower: See Exhibit A for specific location
All other permitted uses of the Tower Site including Licensee's Approved Equipment (as defined in section 1(a) herein), and the Licensed Premises (as defined in section 1(b) herein) are further described in section 4 of this Agreement and Exhibits A and B attached hereto.

## IV. FEES & TERM

Monthly License Fee:  Two Thousand Five Hundred and 00/100 Dollars ($2,500.00), increased by the Annual Escalator on the first anniversary of the Commencement Date of this Agreement and each anniversary of the Commencement Date thereafter during the Term (as defined in section 1(d) herein).  The Annual Escalator shall be 5%.

Application Fee: N/A.

Site Inspection Fee: N/A.

Initial Term: A period of 10 years beginning on the Commencement Date.  The **"Commencement Date"** shall be the earlier of: (i) the issuance of a NTP (as defined in section 1(c) herein) or (ii) October 15, 2009.

Renewal Terms: 3 additional periods of 5 years each.

Connection Fee: N/A

Electricity for operation of Approved Equipment is to be provided by (check one):
☐ Licensor, with the cost of such electricity to be paid by Licensee ("Utility Fee")  subject adjustment pursuant to Section 5(b), OR
☒ Licensee, at its sole expense pursuant to Section 5 (b).

## V. TERMS & CONDITIONS

The attached terms and conditions are incorporated herein by this reference.

## VI. OTHER PROVISIONS:

Other provisions: (check one): ☐ None ☒ As listed below

  a) Licensor and Licensee agree and acknowledge that  the above-referenced Licensee Fee shall be abated for the first two (2) months of the Initial Term.

  b) Notwithstanding anything to the contrary in this Agreement, the offer expressed to Licensee in this Agreement shall automatically become null and void with no further obligation by either party hereto if a structural analysis of the Tower Site completed after the execution of this Agreement by Licensor but before the commencement of the installation of Licensee's Approved Equipment indicates that the Tower Site is not suitable for Licensee's Approved Equipment unless Licensor and Licensee mutually agree that structural modifications or repairs shall be made to the Tower Site on mutually agreeable terms.



**EXHIBIT**

1

#11552v5
SCCA030039.0083/D51/V1

c) In the event that Licensor determines a Shared Site Interference Study is required, Licensor and Licensee agree and acknowledge that this Agreement shall be contingent upon a satisfactory result of said Shared Site Interference Study.

[SIGNATURES ARE ON THE NEXT PAGE]

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, each Party in consideration of the mutual covenants contained herein, and for other good and valuable consideration, intending to be legally bound, has caused this Agreement to be executed by its duly authorized representative as of the date and year written; *provided, however,* that this Agreement shall not become effective as to either Party until executed by both Parties.

LICENSOR
American Towers, Inc., a Delaware corporation,
a wholly owned subsidiary of American Tower
Corporation, a Delaware corporation

By: _____

Print Name: Richard Rossi

Its:  Vice President, Contract Management

Date: _____ 12-21-09

LICENSEE
Polnet Communications, Ltd., an Illinois corporation

By: _____

Print Name: WALTER LOTABA

Its: PRESIDENT

Date: 12.18.09

**TERMS AND CONDITIONS**

1. **SELECT DEFINITIONS.**

(a) **Approved Equipment**. Licensee's telecommunications system, including antennas, radio equipment and operating frequency, cabling and conduits, shelter and/or cabinets, and other personal property owned or operated by Licensee as described on Licensee's equipment schedule attached hereto as <u>Exhibit A</u>, which equipment Licensee anticipates shall be located by Licensee at the Tower Site (as defined in subsection1(e) herein).

(b) **Licensed Premises**. Location of the Approved Equipment on the Tower (defined in subsection 1(e) herein) and at the Tower Site as more specifically described in <u>Exhibits A and B</u> attached hereto.

(c) **NTP or Notice to Proceed.** Written notice from Licensor to Licensee acknowledging that all required documentation for the construction and installation of the Approved Equipment has been received and approved by Licensor and Licensee is authorized to commence its installation of the Approved Equipment at the Licensed Premises, as more particularly set forth in section 10 of this Agreement.

(d) **Term**. Initial Term and each Renewal Term which is effected pursuant to section 6 of this Agreement.

(e) **Tower Site**. Certain real property owned, leased, subleased, licensed or managed by Licensor shown on page 1 of this Agreement, on which a wireless tower ("**Tower**") owned, leased, licensed or managed by Licensor is located.

(f) **CPI**. The Consumer Price Index for All Urban Consumers, U.S. City Average (1982-1984=100), as published by the United States Department of Labor, Bureau of Labor Statistics. If such index is discontinued or revised, such other government index or computation with which it is replaced shall be used in lieu thereof.

2. **GRANT OF LICENSE**. Subject to the other terms of this Agreement, Licensor hereby grants Licensee a non-exclusive license to install, maintain and operate the Approved Equipment at the Licensed Premises. All Approved Equipment shall be and remain Licensee's personal property throughout the Term of this Agreement. Licensor shall maintain the communication facility located on the Tower Site in good order and repair, wear and tear, damage by fire, the elements or other casualty excepted. In no event shall Licensee's license as granted herein include rights to use in any fashion the air space above the Approved Equipment, and Licensor reserves the right to install, construct and/or operate additional improvements or equipment of Licensor or others above Licensee's Approved Equipment or shelter (commonly referred to as "stacking"), provided that such additional improvements or equipment do not materially and adversely interfere with the access to and operation of the Approved Equipment or Licensee's shelter. Licensee is not required to utilize a stackable shelter, provided that, if Licensee opts to install a shelter that is not stackable and if Licensor receives an offer to license the air space above the Licensee's non-stackable shelter by a proposed subsequent user, Licensor may, at its election, upon 30 days prior written notice require the Licensee to replace such non-stackable shelter with a stackable shelter of a comparable size, provided that the proposed subsequent user agrees in writing to be wholly responsible for the cost of the Licensee's shelter replacement. Subject to limitations contained in the Ground Lease (defined in section 21 herein), Licensor grants Licensee a right of access to the Tower Site 24 hours per day, 7 days per week during the Term and a designated location for the installation of Licensee's utilities over, under or across the Tower Site (collectively, "**Easement**"). Licensee shall be responsible for any and all damage or loss that results from the installation of any cables or utility wires by Licensee or any company or person retained by Licensee (including a public utility company), including, without limitation, any damage or loss that results from the accidental cutting of utility wires or cables of any other party operating at the Tower Site. Licensor shall provide Licensee with one set of keys and/or codes to access the Tower Site. Licensee shall be responsible for ensuring that Licensor has, at all times, a complete and accurate written list of all employees and agents of Licensee who have been provided the keys or access codes to the Tower Site. Licensor shall have the right to continue to occupy the Tower Site and to grant rights to others for the Tower Site in its sole discretion. Licensee shall have no property rights or interest in the Tower Site or the Easement by virtue of this Agreement.

3. **EXHIBITS**. Within 45 days following the commencement of the installation of the Approved Equipment, Licensee shall provide Licensor with as-built or construction drawings showing the Approved Equipment as installed [in both hard copy and electronic form] ("**Construction Drawings**"), such Construction Drawings shall include the location of any shelters, cabinets, grounding rings, cables, and utility lines associated with Licensee's use of the Tower Site. Upon receipt, Licensor shall insert hereto the Construction Drawings as <u>Exhibit C</u> hereto. In the event that Licensee fails to deliver the Construction Drawings as required by this section, Licensor may cause such Construction Drawings to be prepared on behalf of Licensee and Licensor shall assess a fee for such Construction Drawings in an amount equal to 120% of the actual cost of obtaining the Construction Drawings including in-house labor, which upon invoice shall become immediately due and payable by Licensee. Licensee shall not infer nor shall acceptance of the Construction Drawings by Licensor be deemed to be a representation by Licensor that such Construction Drawings or the plans and specifications described therein are in compliance with federal, state or local laws, ordinances, rules or regulations or that such installation shall not cause impermissible or unlawful interference. In the event of inconsistency or

#11552v5
SCCA030039.0083/D51/V1

discrepancy between (a) <u>Exhibit A</u> and <u>Exhibit B</u> hereto, <u>Exhibit A</u> shall govern, and (b) between <u>Exhibit A</u> (with respect to Approved Equipment and antenna locations) together with <u>Exhibit B</u> (with respect to ground space installation locations) and <u>Exhibit C</u> hereto, <u>Exhibits A and B</u> shall govern, notwithstanding any approval or signature by Licensor or its agents. Licensee hereby acknowledges and agrees that installation of the Approved Equipment must be in strict accordance with the approved Construction Drawings and <u>Exhibit A and B.</u>

4. **USE.** Subject to the terms of the Ground Lease, Licensee shall be permitted the non-exclusive right to install, maintain, operate, service, modify and/or replace its Approved Equipment at the Licensed Space, which Approved Equipment shall be utilized for the transmission and reception of wireless voice and data communications signals (such transmission and reception to be solely within the Permitted Frequencies and, if applicable within the spectrum licensed to Licensee by the FCC). If as of the Effective Date, Licensee's wireless business consists of a one-way network which requires only that signals be transmitted from the Tower Site, then notwithstanding the foregoing sentence, Licensee's use of Tower Site under this Agreement shall be limited to the transmission of wireless voice and data communications signals. Licensee's permitted use with respect to the Licensed Space shall be limited solely to that enumerated in this section, and, except pursuant to separate agreement with Licensor, no person or entity other than Licensee shall have the right to install, maintain or operate its equipment or transmit or receive communications at, or otherwise use, the Licensed Space.

5. **LICENSE FEES; TAXES; ASSESSMENTS.**

   (a) **Monthly License Fee.** The Monthly License Fee as defined on page 1 of this Agreement as adjusted by the Annual Escalator, shall be payable in advance on the first day of each calendar month during the Term beginning upon the Commencement Date. If the Commencement Date is not the first day of a calendar month, the Monthly License Fee for any partial month shall be prorated on a daily basis.

   (b) **Utilities.** Licensee agrees to install a separate meter on and connect to Licensor's multi-gang meter rack on or before the Site Commencement Date. Licensee shall pay the cost of all utility service necessary, to install, maintain and operate the Approved Equipment. Lessee shall pay to Lessor a monthly fee for the actual cost of utility services ("the Utility Fee"). The Utility Fee shall be determined by taking the actual expense incurred for Lessee's metered use of such utility service. The Utility Fee shall be paid monthly, in arrears, for the prior month's usage. Upon Lessor's reasonable request, Licensee agrees to enter into a monitoring agreement with a third party to monitor Licensee's utility usage at the Tower Site. Licensee shall provide to Licensor an annual report of its utility usage at the Tower Site during the Term of this Agreement prepared by the third party monitoring company.

   (c) **Taxes.** Licensee shall be solely responsible for the reporting and payment when due of any tax related to Licensee's purchase, ownership or operation of any of its equipment at the Tower Site and such reporting and payment shall be made directly to the appropriate tax authorities. Licensor shall be solely responsible for payment to the proper taxing authorities of all real estate taxes due and payable with respect to the Tower Site, including the Licensed Premises. Licensee shall reimburse Licensor for a percentage equal to the Maintenance Fee Percentage, described in paragraph 7 herein below, of all real estate taxes paid on the Tower Site, such reimbursement to be due and payable within 10 days after Licensor's giving to Licensee a written invoice. Licensee acknowledges that the amount for which it is responsible to reimburse Licensor will increase from time to time as taxes increase, even though its percentage obligation will not change except as provided for under Section 7 of this Agreement

   (d) **Federal Use Fees & Assessments.** Licensee agrees to pay or reimburse Licensor for any and all taxes, fees, or other costs and expenses assessed upon or paid by Licensor to the United States Forest Service or Bureau of Land Management attributable to Licensee's Approved Equipment, Licensee's use of or Licensee's presence at the Tower Site.

   (e) **Payment Address.** All payments due under this Agreement shall be made to Licensor at Licensor's Remittance Address as more particularly shown on page 1 of this Agreement or such other address as Licensor may notify Licensee of in writing.

   (f) **No Set-Off.** All payments due under this Agreement shall be due without set-off, notice, counterclaim or demand from Licensor to Licensee.

6. **TERM.**

   (a) **Initial Term.** The Initial Term of this Agreement shall be as specified on page 1.

   (b) **Renewal Term.** The term of this Agreement may be extended for each of the Renewal Terms as specified on page 1 of this Agreement, provided that at the time of each such renewal, (i) the Ground Lease remains in effect and has not expired or been terminated, (ii) Licensee is not in default hereunder and no condition exists which if left uncured would with the passage of time or the giving of notice result in a default by Licensee hereunder and (iii) the original Licensee identified on page 1 of this Agreement has not assigned, sublicensed, subleased or otherwise transferred any of its rights hereunder except to, if at all, a Permitted Affiliate (as defined in section 20 herein). Provided that

the foregoing conditions are satisfied, this Agreement shall automatically renew for each successive Renewal Term unless either Party notifies the other in writing of its intention not to renew this Agreement at least 180 days prior to the end of the then existing Term.

(c) **Confirmation of Commencement Date**. Licensee shall notify Licensor no less than 5 days prior to the date upon which Licensee intends to commence any construction or installation at the Tower Site, together with a construction schedule, so Licensor has the opportunity to be present during any such installation or construction. In addition to the foregoing, Licensee shall notify Licensor of the actual date of Licensee's commencement of any installation or construction at the Tower Site no more than 5 days following such commencement, TIME BEING OF THE ESSENCE, utilizing the form attached hereto as Exhibit D. In the event that Licensee fails to provide such notice, then the Commencement Date shall be deemed to be the Effective Date. Licensee's right to cure under Section 22 of this Agreement shall not be applicable to a failure to deliver timely written notice of such commencement notice.

(d) **Holdover Term**. If Licensee fails to remove the Approved Equipment at the expiration of the Term without a written agreement, such failure shall be deemed to extend the terms of this Agreement on a month-to-month basis under the same terms and conditions herein except that (i) a Monthly License Fee shall be due on or before the first day of every calendar month during such month-to-month term in an amount equal to 150% of the Monthly License Fee in effect for the last month of the Term ("**Holdover Fee**"), such Holdover Fee to escalate annually on the anniversary of the Commencement Date by an amount equal to 6% of the Holdover Fee in effect for the month immediately prior to the month in which escalation takes place, and (ii) the month-to-month extension shall be terminable upon 15 days' prior written notice from either Licensor or Licensee to the other; provided, however, nothing contained herein shall grant Licensee the unilateral right to extend the Term of this Agreement after the expiration of the Term. In addition to the Monthly License Fee payable to Licensor in the event of an extension under this subsection 6(d), Licensee agrees to indemnify and hold Licensor harmless from all losses, costs, damages and expenses (including reasonable attorneys' fees), , arising out of or in connection with the extension, the operation of the Approved Equipment at the Tower Site and Licensee's failure to perform all of its obligations under this Agreement at the termination or earlier expiration of this Agreement.

7. **LIMITED COMMON EXPENSES**. Licensee shall reimburse Licensor for Licensee's pro-rata share of all common expenses (the "Common Expenses") incurred by Licensor in the installation, operation, maintenance and repair of the Tower Site, including, but not limited to, the construction, maintenance and repair of a common septic system and field; all real estate taxes, assessments, levies or other fees assessed or imposed against the Tower Site (including the Leased Premises); all taxes which may be assessed against the Tower Site (whether real property or personal property taxes or other fees or assessment); insurance; common utilities; and any and all other costs of operating and maintaining the Tower Site. Notwithstanding the foregoing, the cost and expenses associated with any damage which is directly attributable to the acts or omissions of Licensee or Licensee's contractors shall be borne solely by Licensee. Licensee shall not be required to pay any share of costs or expenses incurred to replace the tower structure. In the event that Licensee also licenses space within a building or shelter owned by the Licensor on the Tower Site, Licensee shall also reimburse Licensor for its pro-rata share of all common expenses incurred for the operation, maintenance, repair and replacement associated with such building or shelter, including, without limitation, the physical structure of the building, HVAC system, and common utility expenses. In the event that Licensee is connected to a generator or back-up power supply owned by the Licensor, Licensee shall also reimburse Licensor for its pro-rata share of all expenses incurred for the operation, maintenance, repair and replacement associated with such generator, including, without limitation, fuel expenses and replacement. For the purposes of this section, a "pro-rata share" of costs and expenses shall be determined based on the number of licensees using the Tower Site on the first day of the month in which an invoice is mailed to Licensee. Licensee shall reimburse Licensor for common expenses within thirty (30) days following receipt of an invoice from Licensor. Licensor and/or Licensee shall be responsible for the utility costs associated with the operation of Licensee's Approved equipment as set forth on page 1; provided, however, that (a) in no event shall Licensor provide Licensee with telephone service; and (b) in the event that Licensor provides access to electricity or utilities to Licensee for a fixed fee or inclusive in the Monthly License Fee, Licensor reserves the right to reasonably increase such fees based on any change in equipment or increased power requirements by Licensee. Notwithstanding the foregoing, Licensee's pro rata share of costs and expenses pursuant to this Section 7 shall not exceed an amount equal to one times the then-current Monthly License Fee per annum.

8. **SITE INSPECTION**. Concurrent with Licensee's delivery of a fully executed License to Licensor, or before the date of any subsequent modifications to or installation of additional Approved Equipment, Licensee shall pay Licensor the Site Inspection Fee as defined on page 1 of this Agreement. In the event that Licensor installs Licensee's Approved Equipment, Licensor shall waive the Site Inspection Fee with respect to such installation. Licensee acknowledges that any Site Inspection performed by Licensor of Licensee's installation is for the sole purpose and benefit of the Licensor and its affiliates, and Licensee shall not infer from or rely on any inspection by Licensor as assuring Licensee's installation complies with any applicable federal, state or local laws, ordinances, rules and regulations, that the installation was performed in a good, workmanlike manner or that such installation will not cause impermissible or unlawful interference.

9. **LABELING**. Licensee shall identify its equipment and equipment cabinets (unless such cabinet is located in a building owned by Licensee) with labels permanently affixed thereto, indicating Licensee's name, contact phone number, and

installation date. Licensee's coaxial cables shall be labeled at both the top and bottom of the Tower. If Licensee fails to so identify its equipment, Licensor may, in its sole discretion, declare Licensee to be in default of its obligations under this Agreement, terminate electric power to the Approved Equipment and remove the Approved Equipment from the Tower, or Licensor may label Licensee's equipment and assess against Licensee a fee of $1,500.00, as increased annually on each anniversary of the Commencement Date by a percentage rate increase equal to the Annual Escalator, which upon invoice shall become immediately due and payable. Licensee's right to cure under Section 22 of this Agreement shall not be applicable to Licensee's failure to properly label its Approved Equipment.

10. **IMPROVEMENTS BY LICENSEE.**

(a) **Installation and Approved Vendors.** Prior to the commencement of any construction or installation work (the "**Work**") on the Tower Site, Licensee shall submit to Licensor for review and approval, which approval shall not be unreasonably withheld, detailed plans and specifications accurately describing all aspects of the proposed Work. Licensee shall not commence Work on the Tower Site until Licensor issues to Licensee a NTP. Licensor shall issue a NTP only upon request from the Licensee and receipt of the following complete and accurate documentation: (1) evidence that any contingencies set forth in the approval of Licensee's application have been satisfied; (2) evidence that Licensee has obtained all required governmental approvals including, but not limited to, zoning approvals, building permits, and any applicable environmental approvals including copies of the same; (3) a copy of the plans and specifications that have been approved by Licensor for the proposed equipment installation; (4) evidence that any contractors other than Licensor that will be performing work on the Tower Site are on Licensor's approved vendor list, with valid and current worker's compensation and general liability insurance certificates on file with Licensor naming Licensor as an additional insured and which otherwise satisfy the insurance coverage requirements set forth in section 16 of this Agreement; and (5) a construction schedule. In no event will a NTP be issued prior to the payment by Licensee of the Application Fee provided for on Page 1 of this Agreement. Notwithstanding anything to the contrary in this Agreement, Licensor reserves the right, in its sole discretion, to refuse to permit any person or company to climb the Tower.

(b) **Structural Analysis/Interference Analysis.** Prior to the commencement of any Work on the Tower Site by or for the benefit of the Licensee, Licensor may, in its reasonable discretion, perform or cause to be performed a structural analysis to determine the availability of capacity at the Tower Site for the installation or modification of any Approved Equipment and/or additional equipment at the Licensed Premises by Licensee. Licensee agrees to reimburse Licensor for all reasonable costs and expenses incurred by Licensor or Licensor's vendor in the performance of such structural analysis within 30 days following receipt of an invoice from Licensor. In the event a structural analysis is performed after the execution of this Agreement by Licensor but prior to the initial installation of Licensee's Approved Equipment, and such analysis indicates that the existing Tower cannot accommodate the proposed installation of Licensee's Approved Equipment thereon, Licensor or Licensee may terminate this Agreement upon written notice at any time prior to the commencement of Licensee's installation. Prior to the commencement of any initial or subsequent construction or installation on the Tower Site by or for the benefit of the Licensee and/or the modification of the Licensee's radio frequencies propagated from the Licensed Premises, Licensor may elect to perform a shared site interference study ("**SSIS**") and Licensee shall pay Licensor a fee of $1,600.00 per study, as adjusted annually on the anniversary of the Commencement Date by a percentage rate equal to the Annual Escalator. This fee shall be payable at the time of Licensee's application or immediately upon a determination by Licensor that a SSIS is required. In the event a SSIS is performed after the execution of this Agreement by Licensor but prior to the installation of Licensee's Approved Equipment, and such SSIS indicates that the proposed installation of Licensee's Approved Equipment on the Tower is acceptable, such an indication in no way relieves the Licensee of its obligations under section 11 herein.

(c) **Equipment; Relocation, Modification.** Licensee hereby grants Licensee reasonable access to the Licensed Premises for the purpose of installing and maintaining the Approved Equipment and its appurtenances. Except as otherwise provided, Licensee shall be responsible for all site Work to be done on the Leased Premises or the Easement pursuant to this Agreement. Licensee shall provide all materials and shall pay for all labor for the construction, installation, operation, maintenance and repair of the Approved Equipment. Licensee shall not construct, install or operate any equipment or improvements on the Tower Site other than those which are described on Exhibit A, alter the radio frequency described on Exhibit A, or alter the operation of the Approved Equipment without first obtaining the prior consent of Licensor, which consent may be withheld by Licensor in Licensor's sole discretion. Licensee acknowledges that any such relocation or modification of the Approved Equipment may result in an increase in the Monthly License Fee. Licensee shall have the right to remove all Equipment at Licensee's sole expense on or before the expiration or earlier termination of the License provided Licensee repairs any damage to the Tower Site or the Tower caused by such removal. Within 30 days of the expiration or termination of this Agreement for any reason, Licensee shall: (i) remove the Approved Equipment and any other property at the Tower Site of Licensee from the Licensed Premises at Licensee's sole risk, cost, and expense; (ii) deliver the Licensed Premises in substantially the same and in as good a condition as received (ordinary wear and tear excepted); and (iii) repair any damage caused by the removal of the Approved Equipment within 10 days of the occurrence of such damage. If Licensee fails to timely pay the Holdover Fee and/or does not remove its Approved Equipment within 30 days after the expiration or termination of this Agreement, (i) the Approved Equipment shall be deemed conclusively and absolutely abandoned by Licensee and anyone claiming by, through, or under Licensee except for Hazardous Materials (defined in section 27 herein) and waste and

Approved Equipment containing Hazardous Materials and waste, which must be removed by Licensee from the Licensed Premises and Easement prior to the expiration or earlier termination of this Agreement; and (ii) Licensor shall have the right to remove the Approved Equipment at Licensee's sole expense and dispose of such Approved Equipment in any manner Licensor so elects, and Licensee shall reimburse Licensor for its expenses upon demand without off-set.

## 11. RF INTERFERENCE/ USER PRIORITY.

(a) **Definitions.** For purposes of this section 11, the following capitalized terms shall have the meanings set forth herein:

    (i) **Interference** includes any performance degradation, misinterpretation, or loss of information to a radio communications system caused by unwanted energy emissions, radiations, or inductions, but shall not include permissible interference as defined by the FCC, and in addition, with regard to Unlicensed Frequencies, congestion.

    (ii) **Licensed Frequencies** are those certain channels or frequencies of the radio frequency spectrum that are licensed by the FCC in the geographic area where the Tower Site is located.

    (iii) A **Licensed User** is any user of the Tower Site, including Licensee, that transmits and/or receives Licensed Frequencies at the Tower Site, but only with respect to such Licensed Frequencies.

    (iv) A **Priority User** is any Licensed User of the Tower Site that holds a priority position in relationship to Licensee for protection from Interference, as determined in this section 11, which status is subject to change as set forth herein.

    (v) A **Subsequent User** is any user of the Tower Site that holds a subordinate position in relationship to Licensee for protection from Interference, as determined in this section 11, which status is subject to change as set forth herein.

    (vi) **Unlicensed Frequencies** are those certain channels or frequencies of the radio frequency spectrum that are not licensed by the FCC and are available for use by the general public in the geographic area where the Tower Site is located.

    (vii) An **Unlicensed User** is any user of the Tower Site, including Licensee, that transmits and/or receives Unlicensed Frequencies at the Tower Site, but only with respect to such Unlicensed Frequencies.

(b) **Information.** Licensee shall cooperate with Licensor and with other lessees, licensees or occupants of the Tower Site for purposes of avoiding Interference and/or investigating claims of Interference. Upon request, Licensee, within 10 days of Licensor's request, shall provide Licensor with a list of Licensee's transmit and receive frequencies and Approved Equipment specifications necessary to resolve or investigate claims of Interference.

(c) **Unlicensed Frequencies.** Notwithstanding any other provision contained herein, as among Licensor, Licensee and other users of the Tower or Tower Site, (i) an Unlicensed User shall have no priority with respect to any other FCC Unlicensed Users with respect to Interference; and (ii) an Unlicensed User's rights and obligations with respect to such Interference shall be determined and governed by FCC Rules and Regulations and any other applicable law. Licensor expressly disclaims any and all warranties and accepts no responsibility for management, mediation, mitigation or resolution of Interference among FCC Unlicensed Users operating at the Tower Site and shall have no liability therefor.

(d) **Licensed Frequencies.** Subject to FCC Rules and Regulations and other applicable law, the Parties acknowledge and agree that the accepted industry standard for priority protection from Interference between multiple Licensed Users has been based on the priority of occupancy of each user to another user of the Tower or Tower Site, which priority within Licensor has been based on submittal of its collocation application by any user, including Licensee. Should application of FCC Rules and Regulations and other applicable law not resolve any claims of Interference consistent with subsections 11(e), 11(f) and 11(g) below, as among Licensor, Licensee and other users of the Tower Site, (i) each Licensed User's priority shall be maintained so long as the Licensed User does not change the equipment and/or frequency that it is entitled to use at the Tower Site at the time of its initial occupancy; and (ii) Licensee acknowledges and agrees that if Licensee replaces its Approved Equipment or alters the radio frequency of the Approved Equipment to a frequency range other than as described on Exhibit A, Licensee will lose its priority position for protection from Interference with regard to Approved Equipment operating at the new frequency in its relationship to other Licensed Users which are in place as of the date Licensee replaces its Approved Equipment or alters its radio frequency, consistent with this section 11.

(e) **Correction.**

(i) <u>Licensee</u>. Licensee agrees not to cause Interference with the operations of any other user of the Tower or Tower Site and to comply with all other terms and provisions of this section 11 imposed upon Licensee. If Licensor determines, in its reasonable discretion based on standard and accepted engineering practices, that Licensee's Approved Equipment is causing Interference to the installations of Licensor or a Priority User, Licensee shall, within 48 hours of notification from Licensor, commence such actions as are necessary to mitigate or eliminate the Interference, with the exception of ceasing Licensee's operations. If Licensee cannot mitigate or eliminate such Interference within the 48 hour period, Licensor may file a complaint with the FCC (currently the FCC's Enforcement Bureau, Spectrum Enforcement Division) or if such other user of the Tower Site which is subject to Interference from the Licensee's Approved Equipment is a Priority User, then upon the request of such Priority User consistent with Licensor's contractual obligations owed to the Priority User, Licensor may require that Licensee turn off or power down its interfering Approved Equipment and only power up or use such Approved Equipment during off-peak hours specified by Licensor in order to test whether such Interference continues or has been satisfactorily eliminated. If Licensee is unable to resolve or eliminate, to the satisfaction of Licensor, such Interference within 30 days from Licensee's initial notification thereof, Licensee will immediately remove or cease operations of the interfering Approved Equipment.

(ii) <u>Licensor</u>. Upon the request of Licensee, Licensor hereby covenants to take commercially reasonable efforts to prohibit a Subsequent User from causing Interference with the operations of Licensee to the extent Licensee is a Priority User pursuant this section 11. If Licensor determines, in its reasonable discretion based on standard and accepted engineering practices, that a Subsequent User's equipment is causing Interference to the installations of Licensee, upon Licensee's request, Licensor shall, within 48 hours of request, commence such actions as are necessary to mitigate or eliminate the Interference, with the exception of ceasing Subsequent User's operations.

(iii) <u>Government Users</u>. Notwithstanding the foregoing, if another user of the Tower or Tower Site is a governmental entity, Licensor shall give such governmental entity written notice of the Interference within 5 business days of Licensor's determination that such action is reasonably necessary. Licensor shall have the right to give the governmental entity 5 business days, or more as specified in the governmental site or occupancy agreement or as required by applicable law, from the receipt of such notice prior to Licensor being required to take any actions required by this subsection 11 (e) to cure such Interference.

(f) **FCC Requirements Regarding Interference.** Nothing herein shall prejudice, limit or impair Licensee's rights under applicable law, including, but not limited to, FCC Rules and Regulations to redress any Interference independently of the terms of this section 11. Notwithstanding anything herein to the contrary, the provisions set forth in this section 11 shall be interpreted in a manner so as not to be inconsistent with applicable law, including, but not limited to, FCC Rules and Regulations and nothing herein relieves Licensee from complying with all applicable laws governing the propagation of radio frequencies and/or radio frequency interference. The Parties acknowledge that currently FCC Rules and Regulations govern the obligations of wireless telecommunication service providers with respect to the operation of equipment and use of frequencies. Consequently, the provisions set forth in this section 11 are expressly subject to CFR, Title 47, including but not limited to Part 15, et seq, governing Radio Frequency Devices; Part 20, et seq, governing commercial mobile radio services; Part 24, et seq, governing personal communications services; and Part 90, et seq, governing private land mobile radio services. In addition, in accordance with good engineering practice and standard industry protocols, licensees employ a wide range of techniques and practices, including those involving the use of proper types of equipment as well those related to the adjustment of operating parameters, in a mutually cooperative effort to identify and mitigate sources of Interference. The obligation of Part 20 licensees, including, but not limited to, private paging, specialized mobile radio services, cellular radiotelephone service and personal communications services, to avoid Interference is set forth in 47 CFR Part 90, Subpart N – Operating Requirements, §90.403(e). Claims of Interference are ultimately cognizable before the FCC's Enforcement Bureau, Spectrum Enforcement Division. Licensee shall observe good engineering practice and standard industry protocols, applying such commercially reasonable techniques as constitute best practices among licensees, in the deployment of their frequencies and the operation of the Approved Equipment. If Licensee deploys its frequencies or operates the Approved Equipment in a manner which prevents any other user of the Tower or Tower Site from decoding signal imbedded in their licensed frequencies such that the Spectrum Enforcement Division makes a determination that the Licensee is the cause of the Interference and Licensee fails or refuses to mitigate or eliminate the Interference within the time and manner proscribed by the Spectrum Enforcement Division, Licensee shall be default of this Agreement and the remedies set forth in section 23 shall apply.

(g) **Public Safety Interference.** As of the Commencement Date, Licensor and Licensee are aware of the publication of FCC Final Rule, Private Land Mobile Services; 800 MHz Public Safety Interference Proceeding, *Federal Register*: November 22, 2004 (Volume 69, Number 224), Rules and Regulations, Page 67823-67853 (**"Final Rule"**). Claims of Interference made by or against users which are public safety entities shall be in compliance with the Final Rule as and when effective, or otherwise in accordance with FCC Rules and Regulations.

**12. SITE RULES AND REGULATIONS.** Licensee agrees to comply with the reasonable rules and regulations established from time to time at the Tower Site by Licensor, which may be modified by Licensor from time to time upon receipt by Licensee of such revised rules and regulations. Such rules and regulations will not unreasonably interfere with Licensee's use of the Leased Premises under this Agreement.

**13. POWERING DOWN.**

(a) **Non-emergency.** Licensor may require that Licensee temporarily discontinue operation or reduce power of its Approved Equipment in order for Licensor or another user at the Tower Site to install equipment, to modify the Tower or another portion of the Property or equipment located on the Property, or to conduct maintenance or perform repairs. Licensor shall make commercially reasonable efforts not to conduct the maintenance or perform repairs during Licensee's peak hours. Upon prior written consent of Licensor, another user shall have the right to require that Licensee temporarily discontinue operations or reduce power of its Approved Equipment to the extent reasonably necessary to accomplish the aforesaid objectives. If such discontinuance of operation or reduction of power is required for non-emergency work, Licensor shall provide 15 days' prior written notice to Licensee that such discontinuance or reduction must occur. Licensor and Licensee shall act in good faith to arrange a convenient date and time for Licensor or the other user, as applicable, to cause such a discontinuance or reduction by Licensee. If such an arrangement cannot be reached, Licensor shall have the unilateral right to schedule the required work and the required discontinuance or reduction based on its good faith assessment of the respective needs of Licensor and all users.

(b) **Emergency.** In an emergency (an event resulting in or likely to result in injury to persons or property), Licensor may require Licensee, to cease operating, reduce or turn off electrical power, reduce its signal strength, or make other adjustments to its operation upon such notice as may be reasonably practical under the circumstances. In the event the Licensee fails or refuses to discontinue or reduce power due to emergency circumstances as requested by Licensor, or the circumstances dictate that no notice may be given, Licensor may, without liability to Licensee, at its sole and absolute discretion discontinue electric service to Licensee's transmitter and equipment until such emergency circumstances are resolved. Licensor shall restore such electrical service as son as reasonably practical.

**14. CASUALTY; CONDEMNATION.**

(a) **Casualty.** In the event the Tower or other portions of the Tower Site are destroyed or so damaged so as to materially interfere with Licensee's use and occupancy thereof, Licensor or Licensee shall be entitled to elect to cancel and terminate this Agreement on the date of destruction of that portion of the Tower Site and any unearned Monthly License Fee paid in advance of such date shall be refunded by Licensor to Licensee within thirty (30) days of the termination date of this Agreement. Notwithstanding the foregoing, Licensor may elect to restore the Tower Site, in which case Licensee and Licensor shall remain bound hereby but Licensee shall be entitled to an abatement of the Monthly License Fee during the loss of use. If Licensor elects to restore the Tower Site the decision to restore must be made, and Licensee notified of the decision, within 30 days from the date of destruction. The restoration of the Tower Site must be sufficiently completed to allow Licensee to utilize the Tower Site for its designated purposes within 180 days from the date of destruction. If the Tower Site is not so restored within such 180 day time period, then Licensee's sole remedy shall be to terminate this Agreement upon written notice to Licensor.

(b) **Condemnation.** If the whole or a substantial part of the Tower Site shall be taken by any public authority under the power of eminent domain or in deed or conveyance in lieu of condemnation so as to materially interfere with Licensee's use thereof and benefits therefrom, then this Agreement shall terminate as of the date of possession by such authority of that part, and Licensor or Licensee shall have the right to terminate this Agreement and any unearned Monthly License Fee paid in advance of such termination shall be refunded by Licensor to Licensee within 30 days following the termination of this Agreement. Notwithstanding the foregoing, Licensor may elect to rebuild the Tower on an alternate location or property owned, leased or managed by Licensor, in which case Licensee and Licensor shall remain bound hereby provided that: (i) such alternate location is suitable for Licensee's operation as having been conducted at the Tower Site prior to the condemnation; and (ii) Licensee shall be entitled to an abatement of Monthly License Fee during the loss of use. Upon such relocation of the Tower, the Tower Site shall be modified to include the new Tower and the property on which the new Tower is located and this Agreement shall be amended accordingly to clarify the rights of Licensor and Licensee with respect to the new Tower Site. Licensee agrees not to make a claim to the condemning authority for any condemnation award to the extent such claim shall diminish or affect the award made to Licensor with regard to such condemnation.

**15. COMPLIANCE WITH LAWS.** Licensor shall be responsible for compliance with any marking and lighting requirements of the Federal Aviation Administration ("**FAA**") and the FCC applicable to the Tower Site, provided that if the requirement for compliance results from the presence of the Approved Equipment on the Tower, Licensee shall pay the costs and expenses therefor (including any lighting automated alarm system so required). Licensee has the responsibility of carrying out the terms of Licensee's FCC license with respect to tower light observation and notification to the FAA if those requirements imposed on Licensee are in excess of those required of Licensor. Notwithstanding

anything to the contrary in this Agreement, Licensee shall at all times comply with all applicable laws and ordinances and all rules and regulations of municipal, state and federal governmental authorities relating to the installation, maintenance, location, use, operation, and removal of the Approved Equipment and other alterations or improvements authorized pursuant to the provisions of this Agreement.

16. **INDEMNIFICATION; INSURANCE.** Licensor and Licensee each indemnifies the other against and holds the other harmless from any and all costs, demands, damages, suits, expenses, or causes of action (including reasonable attorneys' fees and court costs) which arise out of the use and/or occupancy of the Tower Site by the indemnifying Party. This indemnity does not apply to any claims arising from the gross negligence or intentional misconduct of the indemnified Party. Notwithstanding the foregoing indemnity, except for its own acts of gross negligence or intentional misconduct, Licensor will have no liability for (i) personal injury or death, (ii) loss of revenue sustained by Licensee, (iii) imperfect communications operations experienced by Licensee for any reason, or (iv) acts of third parties, including but not limited to other licensees, subtenants, contractors or subcontractors of Licensor. Licensor and Licensee shall keep in full force and effect, during the Term of this Agreement, insurance coverage in accordance with Exhibit E attached hereto.

17. **LIMITATION OF PARTIES' LIABILITY.** NEITHER LICENSOR NOR LICENSEE SHALL BE RESPONSIBLE FOR, AND HEREBY WAIVES ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES INCURRED RESULTING FROM (i) LICENSEE'S USE OR LICENSEE'S INABILITY TO USE THE TOWER SITE, OR (ii) DAMAGE TO THE OTHER'S EQUIPMENT. If Licensor shall fail to perform or observe any term, condition, covenant or obligation required to be performed or observed by it under this Agreement or is charged with an indemnity obligation hereunder, and if Licensee shall, as a consequence thereof, recover a money judgment against Licensor (whether compensatory or punitive in nature), Licensee agrees that it shall look solely to Licensor's right, title and interest in and to the Tower Site and the Tower for the collection of such judgment, and Licensee further agrees that no other assets of Licensor shall be subject to levy, execution or other process for the satisfaction of Licensee's judgment, and that Licensor shall not be personally liable for any deficiency.

18. **DISCLAIMER OF WARRANTY. LICENSOR HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ASSOCIATED WITH THE TOWER SITE OR THE TOWER. LICENSEE HEREBY ACCEPTS THE TOWER SITE "AS IS, WHERE IS, WITH ALL FAULTS."**

19. **NOTICES.** Any required or permitted notice or demand shall be made by certified mail, postage prepaid or via nationally recognized overnight courier service addressed to the other Party at the address set forth on page 1. Either Party may modify, add, or delete notice addresses from time to time by notice given in accordance with this section. Any notice or demand shall be deemed to have been given or made the next business day after being deposited in a United States Post Office or with a private overnight courier service.

20. **ASSIGNMENT; SUBLEASING.** Licensee may not assign this Agreement as a whole, or any portion of Licensee's rights, title and interests hereunder without Licensor's prior written consent; *provided, however,* that Licensor's consent will not be required for an assignment to (i) any person or entity which is directly or indirectly (through one or more subsidiaries) controlled by, controlling or under common control with Licensee, (ii) is the successor or surviving entity by a merger or consolidation of such entity pursuant to applicable law, or (iii) purchases substantially all the assets of Licensee (collectively, "**Permitted Affiliate**"). For the purpose of this section 20, "control" means ownership, directly or indirectly, of 50% or more of the voting stock, equity or beneficial interest or a general partner of any partnership, and the ability to effectively control or direct the business of such entity. In no event may Licensee sublet, sublease, or permit any other similar use of the Tower Site or Licensed Premises by any other party. Any permitted assignee shall expressly assume, and become bound by, all of Licensee's obligations under this Agreement. Licensor may freely assign, transfer, or sublease this Agreement and, in such event, Licensor shall be relieved of all of its obligations under this Agreement from and after the date of such assignment, transfer, or sublease. Licensee shall pay Licensor a fee of $500.00 (which fee shall increase annually on each anniversary of the Commencement Date by a percentage rate increase equal to the Annual Escalator) in each instance in which Licensee requests Licensor to consent to an assignment of this Agreement or in which Licensee seeks an estoppel certificate, nondisturbance agreement, subordination agreement or other similar agreement to defray the administrative cost incurred by Licensor to process such requests, prepare and process any necessary documentation, and modify its database and other information systems to reflect any such agreement. Such fee is due upon submission of Licensor's request and is hereby deemed fully earned by Licensor upon receipt. Notwithstanding anything to the contrary, Licensor may condition its consent to any assignment, on among other things, (i) requiring that the assignee execute a new form of license agreement so long as the Monthly License Fee and Initial and Renewal Terms of such agreement are consistent with those set forth in this Agreement, and (ii) requiring the assignee to demonstrate that it maintains at the time of such assignment, as evidenced by current financial statements provided to Licensor, a financial position reasonably demonstrating the ability of such assignee to meet and perform the obligations of Licensee hereunder through the unexpired balance of the then current Initial Term or Renewal Term. Any purported assignment by Licensee in violation of the terms of this Agreement shall be void. This Agreement shall be binding upon the successors and permitted assigns of both Parties.

21. **SUBORDINATION TO GROUND LEASE.** The Parties acknowledge and agree that in the event Licensor's rights in the Licensed Premises and/or any part of the Tower Site is derived in whole or part pursuant to an underlying lease,

sublease, permit, easement or other right of use agreement ("**Ground Lease**"), all terms, conditions and covenants contained in this Agreement shall be specifically subject to and subordinate to the terms and conditions of an applicable Ground Lease. In the event that any of the provisions of the Ground Lease are in conflict with any of the provisions of this Agreement (other than those provisions relating to the length of term, termination rights or financial consideration), the terms of the Ground Lease shall control. Further, Licensee agrees to comply with the terms of such Ground Lease as applicable to the access and occupancy of the Licensed Premises. Notwithstanding anything contained in this Agreement to the contrary, if the Ground Lease expires or is terminated for any reason, this Agreement shall terminate on the effective date of such termination and Licensor shall have no liability to Licensee as a result of the termination of this Agreement. Licensor is under no obligation to extend the term of or renew the Ground Lease. Licensor shall give Licensee written notice of such termination or expiration of this Agreement as a result of the termination or expiration of the Ground Lease as soon as practicable. Unless prohibited by the terms of such Ground Lease, upon Licensee's written request, Licensor shall provide a copy of any applicable Ground Lease with the economic terms and other terms that Licensor deems reasonably confidential redacted.

22. **DEFAULT.** The occurrence of any of the following instances shall be considered to be a default or a breach of this Agreement by Licensee: (i) any failure of Licensee to pay the Monthly License Fee, or any other charge for which Licensee has the responsibility of payment under this Agreement, within 10 business days of the date following written notice to Licensee from Licensor, or its designee, of such delinquency, it being understood, however, that Licensor is obligated to provide such notice only two times in each calendar year, and the third instance of the failure to pay the Monthly License Fee or any other charge shall be an immediate default without notice to Licensee if not paid within 10 business days of the date when due; (ii) any failure of Licensee to perform or observe any term, covenant, provision or condition of this Agreement which failure is not corrected or cured by Licensee within 30 days of receipt by Licensee of written notice from Licensor, or its designee, of the existence of such a default; except such 30 day cure period shall be extended as reasonably necessary to permit Licensee to complete a cure so long as Licensee commences the cure within such 30 day cure period and thereafter continuously and diligently pursues and completes such cure; (iii) failure of Licensee to abide by the interference provisions as set forth in section 11; (iv) Licensee shall become bankrupt, insolvent or file a voluntary petition in bankruptcy, have an involuntary petition in bankruptcy filed against Licensee which cannot be or is not dismissed by Licensee within 60 days of the date of the filing of the involuntary petition, file for reorganization or arrange for the appointment of a receiver or trustee in bankruptcy or reorganization of all or a substantial portion of Licensee's assets, or Licensee makes an assignment for such purposes for the benefit of creditors; (v) this Agreement or Licensee's interest herein or Licensee's interest in the Tower Site are executed upon or attached; (vi) Licensee commits or fails to perform an act which results in a default under or nonconformance with the Ground Lease by Licensor and the same shall not be cured within 5 business days (or such shorter time as permitted under the Ground Lease to cure) of the date following written notice to Licensee from Licensor, or its designee, of such default; or (vii) the imposition of any lien on the Approved Equipment except as may be expressly authorized by this License, or an attempt by Licensee or anyone claiming through Licensee to encumber Licensor's interest in the Tower Site, and the same shall not be dismissed or otherwise removed within 10 business days of written notice from Licensor to Licensee.

23. **REMEDIES.** In the event of a default or a breach of this Agreement by Licensee and after the Licensee's failure to cure the same within the time allowed Licensee to cure such default, if applicable, then Licensor may, in addition to all other rights or remedies Licensor may have hereunder at law or in equity, (i) terminate this Agreement by giving written notice to the Licensee, stating the date upon which such termination shall be effective, accelerating and declaring to be immediately due and payable the then present value of all Monthly License Fees and other charges or fees which would have otherwise been due Licensor absent a breach of the Agreement by Licensee, discounted by an annual percentage rate equal to 5%, (ii) terminate electrical power to the Approved Equipment, and/or (iii) remove the Approved Equipment without being deemed liable for trespass or conversion and store the same at Licensee's sole cost and expense for a period of 30 days after which the Approved Equipment, other than Hazardous Materials, will be deemed conclusively abandoned if not claimed by Licensee. Licensee shall pay all reasonable attorney's fees, court costs, removal and storage fees (including any damage caused thereby), and other items of cost reasonably incurred by Licensor in recovering the Monthly License Fee or other fee or charge. Licensee shall not be permitted to claim the Approved Equipment until Licensor has been reimbursed for removal and storage fees. No endorsement or statement on any check or letter accompanying a check for payment of any monies due and payable under the terms of this Agreement shall be deemed an accord and satisfaction, and Licensor may accept such check or payment without prejudice to its right to recover the balance of such monies or to pursue any other remedy provided by law or in this Agreement. Licensor shall accept any such partial payment for the account of Licensee. Past due amounts under this Agreement will bear interest from the date upon which the past due amount was due until the date paid at a rate equal to 18% per annum, or at a lower rate if required by law in the state in which this Agreement is to be performed.

24. **GOVERNMENTAL APPROVALS; PERMITS.** In the event that any governmental permit, approval or authorization required for Licensor's use of, operation of, or right to license space to Licensee at the Tower Site is terminated or withdrawn by any governmental authority or third party as part of any governmental, regulatory, or legal proceeding, Licensor may terminate this Agreement. Licensee hereby agrees that in the event of a governmental or legal order requiring the removal of Licensee's Approved Equipment from the Tower, the modification of the Tower, or the removal of the Tower, Licensee shall remove its Approved Equipment promptly, but in no event later than the date required by such order, at Licensee's sole cost and expense. Licensor shall cooperate with Licensee in Licensee's efforts to obtain

any permits or other approvals that may be necessary for Licensee's installation and operation of the Approved Equipment, provided that Licensor shall not be required to expend any funds or undertake any liability or obligation in connection with such cooperation. Licensor may elect to obtain such required approvals or permits on Licensee's behalf, at Licensee's sole cost and expense. In no event may Licensee encourage, suggest, participate in or permit the imposition of any restrictions or additional obligations whatsoever on the Tower Site or Licensor's current or future use or ability to license space at the Tower Site as part of or in exchange for obtaining any such approval or permit. In the event that Licensee's shelter or cabinets are installed above a third-party or Licensor-owned shelter or building, Licensee shall be solely responsible for obtaining any required approvals, or permits in connection with such shelter or cabinet installation, excepting the consent of other users at the Tower Site and/or the Ground Landlord which shall remain the sole responsibility of Licensor where required.

25. **REPLACEMENT OF TOWER.** Licensor may, at its election, replace or rebuild the Tower or a portion thereof. Such replacement will (i) be at Licensor's sole cost and (ii) not result in an interruption of Licensee's communications services beyond that which is necessary to replace the new Tower. Licensee may establish a temporary facility on the Tower Site to provide such services as Licensee deems necessary during any such construction by Licensor so long as adequate space is then available. The location of such temporary facilities shall be subject to Licensor's approval. At the request of either Party, Licensor and Licensee shall enter into an amendment to this Agreement to clarify the rights of Licensor and Licensee to the new Tower Site.

26. **EMMISSIONS.** If antenna power output ("**RF Emissions**") is presently or hereafter becomes subject to any restrictions imposed by the FCC or other governmental agency for RF Emissions standards on Maximum Permissible Exposure ("**MPE**") limits, or if the Tower Site otherwise becomes subject to federal, state or local rules, regulations, restrictions or ordinances, Licensee shall comply with Licensor's reasonable requests for modifications to the Approved Equipment which are reasonably necessary for Licensor to comply with such limits, rules, regulations, restrictions or ordinances and Licensor shall use commercially reasonable efforts to cause all other licensees of the Tower Site to promptly comply. If Licensor requires an engineering evaluation or other power density study be performed to evaluate RF Emissions compliance with MPE limits, then all reasonable costs of such an evaluation or study shall be paid proportionately by Licensee and all other licensees of the Tower within 30 days of Licensor's request therefor. If said study or a study sponsored by any governmental agency indicates that RF Emissions at the Tower Site do not comply with MPE limits, then Licensee and Licensor, each for itself, shall immediately take any and all steps necessary to ensure that it is individually in compliance with such limits, up to and including cessation of operation, until a maintenance program or other mitigating measures can be implemented to comply with MPE and in addition, Licensor shall use commercially reasonable efforts to cause all other licensees of the Tower to take similar steps necessary to ensure that they are individually in compliance with such limits.

27. **ENVIRONMENTAL INDEMNIFICATION.**

(a) **Licensee.** Licensee, its heirs, grantees, successors, and assigns shall indemnify, defend, reimburse and hold harmless Licensor from and against any and all environmental damages, caused by activities conducted on the Tower Site by Licensee, and (i) arising from the presence of any substance, chemical or waste identified as hazardous, toxic or dangerous in any applicable federal, state or local law or regulation including petroleum or hydrocarbon based fuels such as diesel, propane or natural gas (collectively, "**Hazardous Materials**") upon, about or beneath the Tower Site or migrating to or from the Tower Site, or (ii) arising in any manner whatsoever out of its or its contractors, subcontractors, employees and agents violation of any environmental requirements pertaining to the Tower Site and any of their activities thereon. Licensee covenants that it shall not nor shall Licensee allow its employees, agents or independent contractors to use, treat, store or dispose of any Hazardous Materials on the Licensed Premises or the Tower Site.

(b) **Licensor.** Licensor, its grantees, successors, and assigns shall indemnify, defend, reimburse and hold harmless Licensee from and against any and all environmental damages arising from (i) the presence of Hazardous Materials upon, about or beneath the Tower Site or migrating to or from the Tower Site, or (ii) arising in any manner whatsoever out of the violation of any environmental requirement pertaining to the Tower Site and any activities thereon, either of which conditions came into existence prior to the execution of this Agreement and are solely attributable to activities conducted on the Tower Site by Licensor.

(c) **Survivorship.** The provisions of this section 26 shall expressly survive any termination or expiration of this Agreement.

28. **SUBROGATION.**

(a) **Waiver.** Licensor and Licensee waive all rights against each other and any of their respective consultants and contractors, agents and employees, for damages caused by perils to the extent covered by the proceeds of the insurance provided herein, except such rights as they may have to the insurance proceeds. All insurance policies required under this Agreement shall contain a waiver of subrogation provision under the terms of which the insurance carrier of a Party waives all of such carrier's rights to proceed against the other Party. Licensee's insurance policies shall provide such waivers of subrogation by endorsement. The Licensee shall require by appropriate agreements, written where legally required for validity, similar waivers from its contractors and subcontractors. A waiver of subrogation shall be effective as to a person or entity even though that person or entity

Case 2:16-cv-00781-DEJ   Filed 06/22/16   Page 20 of 28   Document 1

would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

(b) **Mutual Release**. Notwithstanding anything in this Agreement to the contrary, Licensor and Licensee each release the other and its respective affiliates, employees and representatives from any claims by them or any one claiming through or under them by way of subrogation or otherwise for damage to any person or to the Tower Site and to the fixtures, personal property, improvements and alterations in or on the Tower Site that are caused by or result from risks insured against under any insurance policy carried by each and required by this Agreement, provided that such releases shall be effective only if and to the extent that the same do not diminish or adversely affect the coverage under such insurance policies and only to the extent of the proceeds received from such policy.

29. **GOVERNING LAW**. This Agreement shall be governed by the laws of the state in which the Tower Site is located, with the exception of its choice of laws provisions. If any provision of this Agreement is found invalid or unenforceable under judicial decree or decision, the remaining provisions of this Agreement shall remain in full force and effect. Any approval, consent, decision, or election to be made or given by a Party may be made or given in such Party's sole judgment and discretion, unless a different standard (such as reasonableness or good faith) is provided for explicitly.

30. **FINANCING AGREEMENT**. Licensee may, upon written notice to Licensor, mortgage or grant a security interest in the Approved Equipment to any such mortgagees or holders of security interests including their successors and assigns. No such security interest shall extend to, affect or encumber in any way the interests or property of Licensor.

31. **MISCELLANEOUS**. Upon Licensor's written request, Licensee shall promptly furnish Licensor with complete and accurate information in response to any reasonable request by Licensor for information about any of the Approved Equipment or utilities utilized by Licensee at the Tower Site or any of the channels and frequencies utilized by Licensee thereon. In the event that this Agreement is executed by Licensor, its Affiliates or any trade name utilized by the Licensor or its Affiliates and such signatory does not hold the real Tower Site or leasehold interest in the affected Tower Site, the execution of this Agreement shall be deemed to have been properly executed by the Licensor or Licensor's Affiliate which properly holds such interest in the affected Tower Site. Either Licensor or Licensee may be referred to herein as a "**Party**" and both Licensor and Licensee together may be referred to herein as the "**Parties**". Upon the termination or expiration of this Agreement, Licensee shall immediately upon the request of Licensor deliver a release of any instruments of record evidencing such Agreement. Notwithstanding the expiration or earlier termination of the Agreement, and sections 15, 16, 17, and 26 shall survive the expiration or earlier termination of the Agreement. No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provision herein (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly agreed to in writing by the affected Party. This Agreement constitutes the entire agreement of the Parties hereto concerning the subject matter herein and shall supersede all prior offers, negotiations and agreements, whether written or oral. No revision of the Agreement shall be valid unless made in writing and signed by authorized representatives of both Parties.

32. **CONFIDENTIALITY**. Neither Party shall use the other's name, service mark or trademark in any public announcement or advertisement without the prior written consent of the other Party, which may be withheld in such Party's sole and absolute discretion.

**The offer of license expressed in this Agreement shall automatically expire and become void if two unaltered counterparts of this Agreement, executed by Licensee, are not delivered to Licensor within 30 days of the Effective Date.**

**ATTACHED EXHIBITS:**
Exhibit A: List of Approved Equipment and location of the Licensed Premises; Transmitting and Receiving Frequencies
Exhibit B: Site Drawing indicating the location of ground space for Licensee's equipment shelter or space in Licensor's building (as applicable)
Exhibit C: As-Built Drawings or Construction Drawings to be attached within 45 days after Commencement Date in accordance with Section 3.
Exhibit D: Form of Commencement Date Notice.
Exhibit E: Insurance.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Exhibit A**
**List of Approved Equipment and location of the Licensed Premises; Transmitting and Receiving Frequencies**

#11552v5
SCCA030039.0083/D51/V1

Polnet Communications, Ltd.          MILWAUKEE, WI1

## GROUND SPACE REQUIREMENTS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PRIMARY CONTIGUOUS LEASE AREA DIMENSIONS (LxWxH (ft)) | | | 10' x 10' x 8' | Sq ft. | | | | | | |
| INSIDE ATC SHELTER | X | DIMENSIONS (LxWxH (ft)) | 10' x 10' x 8' | | | | | | | |
| CUSTOMER SHELTER | | DIMENSIONS (LxWxH (ft)) | N/A | PAD FOR SHELTER | DIMENSIONS (LxW (ft)) | N/A | STOOF | DIMENSIONS (LxW (ft)) | | N/A |
| OUTDOOR CABINETS | | QUANTITY OF CABINETS | N/A | DIMENSIONS (LxWxH (ft)) | N/A | PAD FOR CABINETS | DIMENSIONS (LxW (ft)) | N/A | | |

## BACKUP POWER REQUIREMENTS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| GENERATOR NOT REQUIRED? | | ATC SHARED GENERATOR | X | SHARED GENERATOR CAPACITY NEEDED (KW) | 5kw | | | | | |
| INSIDE CUSTOMER SHELTER | X | GENERATOR (to be located inside primary leasing area) | | GENERATOR (to be located outside primary leasing area) | | | | | | |
| ADDITIONAL LEASE AREA REQUIRED | | N/A | | | | | | | | |
| MANUFACTURER | N/A | | MAKE / MODEL | | N/A | CAPACITY (KW) | | N/A | FUEL TYPE | N/A |
| PAD FOR GENERATOR | | DIMENSIONS (LxW (ft)) | N/A | | | | | | | |
| FUEL TANK | | DIMENSIONS (LxW (ft)) | N/A | TANK SIZE (gal) | N/A | | | | | |
| PAD FOR FUEL TANK (if required) | | DIMENSIONS (LxW (ft)) | N/A | | | | | | | |

## SECONDARY LEASE AREA REQUIREMENTS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Will supplementary ground space be needed to accommodate additional equipment? | | Y | | N | X | | | | |
| IF YES, ADDITIONAL LEASE AREA DIMENSIONS (LxWxH (ft)) | N/A | Sq ft. | N/A | | | | | | |
| Minimum space required if requested area not available (LxWxH (ft)) | N/A | | Sq ft | N/A | | | | | |
| ADDITIONAL EQUIPMENT: | N/A | | DIMENSIONS (LxWxH (ft)) | N/A | | | | | |
| ADDITIONAL EQUIPMENT: | N/A | | DIMENSIONS (LxWxH (ft)) | N/A | | | | | |

## POWER/TELCO REQUIREMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| POWER PROVIDED BY: | UTILITY COMPANY DIRECT | | ATC PROVIDED | X | Average monthly power consumption (Kw unkn): N/A | |
| TELCO/INTERCONNECT REQUIREMENTS: | POTS | 1 | T1 | X | MICROWAVE | FIBER OPTICS |

## TRANSMITTER SPECIFICATIONS (& RECEIVER for Broadcast Customer ONLY)

| | | | | | | |
|---|---|---|---|---|---|---|
| TRANSMITTER/RECEIVER TYPE | N/A | N/A | N/A | N/A | N/A | N/A |
| QTY of TRANSMITTERS/RECEIVERS | 1 | N/A | N/A | N/A | N/A | N/A |
| MANUFACTURER | Larcan | N/A | N/A | N/A | N/A | N/A |
| TYPE & MODEL | 3 Phase Revised Series, Model XXG-1 | N/A | N/A | N/A | N/A | N/A |
| TYPE of TECHNOLOGY | TV | N/A | N/A | N/A | N/A | N/A |
| TX POWER OUTPUT | 1Kw | N/A | N/A | N/A | N/A | N/A |
| *ERP (Watts) | 15 kw | N/A | N/A | N/A | N/A | N/A |
| ELECTRICO SERVICE REQUIRED (Amps/Volts) | /208V | N/A | N/A | N/A | N/A | N/A |

## ANTENNA EQUIPMENT (REMAINING & PROPOSED) SPECIFICATIONS

| | | | | | | |
|---|---|---|---|---|---|---|
| EQUIPMENT TYPE: | LPTV | N/A | N/A | N/A | N/A | N/A |
| RAD CENTER AGL (ft) | 829' | N/A | N/A | N/A | N/A | N/A |
| EQUIPMENT MOUNT HEIGHT (ft) | 814-843' | N/A | N/A | N/A | N/A | N/A |
| EQUIPMENT MOUNT TYPE | Side Arm | N/A | N/A | N/A | N/A | N/A |
| EQUIPMENT MANUFACTURER | Dielectric | N/A | N/A | N/A | N/A | N/A |
| EQUIPMENT MODEL # | TLP 24 M | N/A | N/A | N/A | N/A | N/A |
| EQUIPMENT DIMENSIONS (HxWxD) (indicate feet or inches) | 45' | N/A | N/A | N/A | N/A | N/A |
| EQUIPMENT WEIGHT (per item, in lbs.) | 460 lbs | N/A | N/A | N/A | N/A | N/A |
| EQUIPMENT QUANTITY | 1 | N/A | N/A | N/A | N/A | N/A |
| AZIMUTHS / DIRECTION of RADIATION (degrees) i.e. "0/180/240" | 180 to 0, 270 center (Wraa) | N/A | N/A | N/A | N/A | N/A |
| QTY. in EACH AZIMUTH / SECTOR, i.e. "4/4/4" | 1 | N/A | N/A | N/A | N/A | N/A |
| TRANSMIT, RECEIVE or TRANSMIT & RECEIVE | Transmit | N/A | N/A | N/A | N/A | N/A |
| TX FREQUENCY | 569 mhz (Ch 30) | N/A | N/A | N/A | N/A | N/A |
| RX FREQUENCY | N/A | N/A | N/A | N/A | N/A | N/A |
| Is equipment using unlicensed frequencies? | No | N/A | N/A | N/A | N/A | N/A |
| ANTENNA GAIN | 10.84 db | N/A | N/A | N/A | N/A | N/A |
| TOTAL # of LINES for equipment in column | 1 | N/A | N/A | N/A | N/A | N/A |
| LINE QTY. in EACH AZIMUTH / SECTOR, i.e. "3/3/3" | 1 | N/A | N/A | N/A | N/A | N/A |
| LINE TYPE | Coax | N/A | N/A | N/A | N/A | N/A |
| LINE DIAMETER / SIZE | 3-1/4" Air | N/A | N/A | N/A | N/A | N/A |

## EXHIBIT B
### Site Drawing indicating the location of ground space for Licensee's equipment shelter or space in Licensor's building (as applicable)

Licensee shall not commence installation until Licensor
has approved in writing said drawing and attached it hereto.

#11552v5
SCCA030039.0083/D51/V1



AMERICAN TOWER

SITE DESIGN

THESE DRAWINGS AND/OR THE ACCOMPANYING SPECIFICATIONS AS INSTRUMENTS OF SERVICE, ARE THE EXCLUSIVE PROPERTY OF AMERICAN TOWER CORPORATION AND THEIR USE AND PUBLICATION SHALL BE RESTRICTED TO THE ORIGINAL SITE FOR WHICH THEY WERE PREPARED. RE-USE, REPRODUCTION OR PUBLICATION BY ANY METHOD, IN WHOLE OR IN PART, IS PROHIBITED EXCEPT BY WRITTEN PERMISSION FROM AMERICAN TOWER CORPORATION. TITLE TO THESE PLANS AND/OR SPECIFICATIONS SHALL REMAIN WITH AMERICAN TOWER CORPORATION WITHOUT PREJUDICE. VISUAL CONTACT WITH THESE PLANS AND/OR SPECIFICATIONS SHALL CONSTITUTE PRIMA FACIE EVIDENCE OF THE ACCEPTANCE OF THESE RESTRICTIONS.

| REV. | DESCRIPTION |
| △ | ADDED POCKET COMMUNICATIONS |

SITE NUMBER: 75054
SITE NAME:
MILWAKEE WI1
WISCONSIN

| DRAWN BY: | M WHITE |
| DATE DRAWN: | 12/21/03 |
| CUSTOMER: | POCKET COMM |
| COLLOCATION NO.: | #34696 |

LEGEND

⊕ GROUNDING TEST WELL
AC AIR CONDITIONING UNIT
B BOLLARD
C CABINET
CFO FIBER OPTIC CABINET
E ELECTRICAL SERVICE DISC
GEN GENERATOR
G GENERATOR RECEPTACLE
IB ICE BRIDGE
M METER RACK
PB PULL BOX
PP POWER POLE
T TELEPHONE HOOKUP
TD TELEPHONE DEMARK
TRN TRANSFORMER
W WATER VALVE

DIMENSIONS NOT VERIFIED BY LICENSED SURVEYOR

SHEET TITLE:
SITE PLAN LAYOUT

SHEET NUMBER: SP-1

REV. # 2

---

55' X 155'
BUILDING

CLEARWIRE
PROPOSED
7' X 7'
GROUND SPACE

POCKET COMM
PROPOSED
12' X 10'
GROUND SPACE
+SOIL VALVE

20'-0"

GUY
TOWER

22' X 50'
STAIRWAY

4'-0"
GATE

11'-0"

24'-9"

4'-0"
GATE

N

GRAPHIC SCALE

20    10    0         20
( IN FEET )
1 UNIT = 20 FEET

## Exhibit C
## As Built Drawings or Construction Drawings

To be attached hereto within 45 days after the Commencement Date.

#11552v4

[Date]

**Via Return Receipt Requested First Class Mail**

**American Tower**

**Attn: Contracts Manager**

Re: ATC Tower Site # _____, ATC Tower Site Name: _____

Dear Contracts Manager:

In accordance with Section 1 of that License Agreement ("Agreement") dated _____ between _____ ("Licensor") and _____ ("Licensee"), this letter serves as notice that Licensee commenced its construction and/or installation at the Tower Site described above on _____ _____, 20____.

The Agreement states that the Commencement Date for the purposes of the Monthly License Fee is the earlier of the commencement of installation or construction or _____, 2_____ (but in no event later than 45 days after the Effective Date of the Agreement.

In accordance with the Agreement, the correct Commencement Date for this Agreement is _____, 2_____.

If you have any questions, please contact me at _____.

Sincerely,

#11552v4

## EXHIBIT E
## Insurance

A.   LICENSOR shall maintain in full force during the term of this Agreement the following insurance:

   1.   Worker's Compensation Insurance with statutory limits in accordance with all applicable state, federal and maritime laws, and Employers' Liability Insurance with minimum limits of $500,000.00 per accident/occurrence, or in accordance with all applicable state, federal and maritime laws.

   2.   Commercial General Liability Insurance (Bodily Injury and Tower Site Damage), the limits of liability of which shall not be less than $1,000,000.00 per occurrence.

   3.   An umbrella policy of not less than Five Million Dollars ($5,000,000.00).

   The above insurance shall provide that LICENSEE will receive not less than 30 days written notice prior to any cancellation of, or material change in coverage. The insurance specified in this Item A shall contain a waiver of subrogation against LICENSEE and shall name LICENSEE as an additional insured, and shall be primary over any insurance coverage in favor of LICENSEE but only with respect to and to the extent of the insured liabilities assumed by LICENSOR under this Agreement and shall contain a standard cross-liability endorsement.

B.   LICENSEE shall maintain in full force during the term of this Agreement and shall cause all contractors or subcontractors performing Work on any Licensed Site prior to the commencement of any such Work on behalf of Licensee to maintain the following insurance:

   1.   Worker's Compensation Insurance with statutory limits in accordance with all applicable state, federal and maritime laws, and Employers' Liability Insurance with minimum limits of $500,000.00 per accident/occurrence, or in accordance with all applicable state, federal and maritime laws.

   2.   Commercial General Liability Insurance (Bodily Injury and Tower Site Damage), the limits of liability of which shall not be less than $1,000,000.00 per occurrence.

   3.   An umbrella policy of not less than Five Million Dollars ($5,000,000.00).

   The above insurance shall provide that LICENSOR will receive not less than 30 days written notice prior to any cancellation of, or material change in coverage. The insurance specified in this Item B shall contain a waiver of subrogation against LICENSOR and shall name LICENSOR as additional insured, and shall be primary over any insurance coverage in favor of LICENSOR but only with respect to and to the extent of the insured liabilities assumed by LICENSEE under this Agreement and shall contain a standard cross-liability endorsement.

C.   Notwithstanding the foregoing insurance requirements, (a) the insolvency, bankruptcy, or failure of any insurance company carrying insurance for either Party, or failure of any such insurance company to pay claims accruing, shall not be held to waive any of the provisions of this Agreement or relieve either Party from any obligations under this Agreement, and (b) the Licensor reserves the right, from time to time, to increase the required liability limits described above in Items A and/or B in accordance with then-current customary insurance requirements in the tower industry nationally.

#11552v4